## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **REBECCA HARMON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV1281 LMB** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Rebecca Harmon for Disability Insurance Benefits under Title II of the

Social Security Act.  This case has been assigned to the undersigned United States Magistrate

Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See

28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 13).  Defendant

filed a Brief in Support of the Answer.  (Doc. No. 18).

## Procedural History

On August 26, 2009, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on August 22, 2008.  (Tr. 173-74).  This claim was

denied initially and, following an administrative hearing, plaintiff's claim was denied in a written

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

opinion by an Administrative Law Judge (ALJ), dated June 23, 2011.  (Tr. 80-84, 9-18).  Plaintiff

then filed a request for review of the ALJ's decision with the Appeals Council of the Social

Security Administration (SSA), which was denied on May 31, 2012.  (Tr. 7, 1-6).  Thus, the

decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981,

416.1481.

## Evidence Before the ALJ

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on April 26, 2011.  (Tr. 25).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present was vocational expert Dr. John

McGowan.  (Id.).

The ALJ examined plaintiff, who testified that she lives in a home with her husband and

her seven-year-old son.  (Tr. 27).  Plaintiff stated that her husband works full-time, and she is

home alone during the day.  (Id.).

Plaintiff testified that she has a twelfth grade education.  (Id.).

Plaintiff stated that she worked as a manager at a convenience store and a fast food

restaurant.  (Id.).  Plaintiff testified that she managed eight people at this position.  (Id.).

Plaintiff stated that she last worked in August of 2008.  (Id.).  Plaintiff testified that she

worked at Arrowfield Technologies as a production worker operating an auger machine.  (Tr.

28).

Plaintiff testified that she took nursing classes at East Central College for three months.

(Tr. 29).

Plaintiff stated that she received unemployment benefits for three to four months beginning

- 2 -

in August of 2008.  (Id.).  Plaintiff stated that she took medical leave from her position at

Arrowfield Technologies, and was never able to return to this job.  (Tr. 30).  Plaintiff testified that

she looked for other production jobs during this period.  (Id.).

 Plaintiff stated that she weighed 261 pounds.  (Tr. 31).

 Plaintiff's attorney stated that plaintiff has diagnoses of peripheral neuropathy,[2] arthritis,

and a lesion on the brain.  (Id.).  The ALJ noted that an MRI indicated that a lesion on plaintiff's

brain was indeterminable.  (Id.).

 Plaintiff's attorney examined plaintiff, who testified that on a typical day, it takes her about

twenty minutes to get out of bed due to pain in her feet, legs, and arms.  (Tr. 32).  Plaintiff stated

that she is able to move around after twenty minutes.  (Id.).  Plaintiff testified that she gets up

early, at around 5:30 a.m., so she has enough time to get ready.  (Id.).  Plaintiff stated that she

gets her son ready, who has to be on the bus at 7:05 a.m.  (Id.).  Plaintiff testified that she then

takes her medication and lies down for a few hours, because she experiences severe pain in her

legs.  (Id.).  Plaintiff described her pain as an aching, throbbing pain, with a tingling, "pins and

needles" sensation in her feet.  (Id.).  Plaintiff testified that, after she wakes from her nap, she

takes a second dose of medication.  (Tr. 34).  Plaintiff stated that she lies down on her couch or

sits down "in a stupor daze," due to her medications.  (Tr. 35).

 Plaintiff stated that her kids help her with the laundry.  (Id.).  Plaintiff testified that she has

a friend who comes over two to four times a week and helps her with laundry, cleaning, and other

household chores.  (Id.).  Plaintiff stated that her neighbors mow her grass.  (Id.).  Plaintiff

---

 [2]A disease affecting the peripheral nervous system, and causing a tingling or burning pain
in the hands and feet.  See Stedman's Medical Dictionary, 1313 (28th Ed. 2006).

testified that she needs help with household chores because her pain is so severe and she is disoriented after taking her medication.  (Id.).

Plaintiff stated that she started taking a new medication in February of 2011 that makes her drowsy.  (Id.).  Plaintiff testified that, prior to that time, she was on many different medications that had various side effects.  (Id.).

Plaintiff testified that she eats lunch and takes Topamax[3] at noon.  (Tr. 36).  Plaintiff stated that she gets up and tries to wash dishes or perform other household chores after that. (Id.).  Plaintiff stated that she starts experiencing muscle spasms in her legs, and shaking in her arms after about thirty minutes of activity.  (Id.).  Plaintiff testified that these episodes last for about thirty minutes, and she hides in her room when they occur so her son does not see them. (Id.).  Plaintiff stated that she lies down around 1:00 p.m.  because she is depressed that she has not accomplished anything.  (Tr. 37).  Plaintiff testified that she waits for her son to come home from school.  (Id.).

Plaintiff stated that a seven-year-old neighbor girl often comes over after school and helps plaintiff fold laundry.  (Id.).  Plaintiff stated that she is unable to fold laundry because she experiences severe pain in her arms.  (Tr. 38).

Plaintiff testified that around 4:00 p.m., she spends time with her husband.  (Id.).  Plaintiff stated that her husband cooks dinner because she is not able to cook due to the pain in her legs. (Tr. 39).

Plaintiff's attorney noted that plaintiff was waving her wrist.  (Id.).  Plaintiff testified that

_____

[3]Topamax is indicated for the treatment of seizures and migraine headaches.  See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

- 4 -

she was experiencing pain in her arm and that it was time for her next dosage of pain medication. (Id.).  Plaintiff stated that she did not take her medication because it would make her disoriented and unable to testify.  (Id.).

Plaintiff testified that she eats dinner with her husband and son, and then the family watches television.  (Id.).  Plaintiff stated that she goes to sleep around 8:30 p.m.  (Id.).  Plaintiff testified that she does not sleep well because her anxiety medication causes insomnia.  (Tr. 40). Plaintiff stated that she also wakes up during the night due to pain.  (Id.).  Plaintiff testified that she does not feel rested and alert in the morning.  (Id.).

Plaintiff testified that she stopped driving about seven months prior to the hearing because she almost ran off the road while she was having a spasm.  (Tr. 41).

Plaintiff's attorney noted that plaintiff was using a wheelchair during the hearing.  (Id.). Plaintiff stated that she uses a wheelchair because she falls when she tries to walk.  (Tr. 42).

The ALJ re-examined plaintiff, who testified that she is able to sit for about thirty minutes without pain.  (Id.).  Plaintiff stated that her back and hips start to hurt after thirty minutes, and she has to move around and stand.  (Id.).  Plaintiff testified that she is able to stand for twenty minutes if she leans against something.  (Id.).  Plaintiff stated that she was able to walk one block before her legs started giving out.  (Id.).  Plaintiff testified that she is able to lift a gallon container of milk.  (Id.).

The ALJ examined vocational expert Dr. McGowan, who stated that plaintiff's past work is classified as follows: fast food worker (light); manager of food service (light); sales attendant (light); machine operator (light to medium); farm worker (heavy); and cashier (light).  (Tr. 46-47).

The ALJ asked Dr. McGowan to assume a hypothetical claimant with the following limitations: light exertional work; no climbing stairs, ramps, ropes, ladders or scaffolding; and can frequently push and pull, and do fine manipulation with her fingers.  (Tr. 47).  Dr. McGowan testified that the individual could perform plaintiff's past work as cashier, front desk clerk, and fast food worker.  (Tr. 48).

The ALJ next asked Dr. McGowan to assume the individual were limited to sedentary exertional work.  (Id.).  Dr. McGowan testified that the individual would be unable to perform any of plaintiff's past relevant work, but she would be capable of performing other work, such as circuit board assembler (472,900 positions nationally, 5,000 in Missouri); final assembly of optical products (288,470 positions nationally, 1,160 in Missouri); and hand for photofinished products (144,000 positions nationally, 1,960 in Missouri).  (Tr. 50-51).

Plaintiff's attorney next examined Dr. McGowan, who testified that an individual with the limitations provided in the first and second hypotheticals with the additional limitation of sitting and standing for less than two hours a day would be unable to perform the jobs he listed.  (Tr. 52).

Dr. McGowan stated that an individual who would be subject to unexpected, unpredictable falling at least fifty percent of the day would be unable to perform any of the jobs he listed.  (Id.).

Dr. McGowan testified that an individual whose pain constantly interferes with attention and concentration needed to perform even simple work would be unable to work.  (Tr. 53).  Dr. McGowan also stated that the following individual limitations would preclude all work: more than ten unscheduled rest breaks lasting up to twenty minutes; more than four absences a month; and a

- 6 -

need to lie down three to four hours during the day.  (Id.).

The ALJ indicated that he would leave the record open so that plaintiff could submit additional medical records supporting an RFC assessment provided by plaintiff's doctor.  (Tr. 54).

In a "post-hearing addendum to the record," the ALJ indicated that there were no clinical findings to support the RFC assessment "at 14F."  (Id.).

## B.    Relevant Medical Records

Plaintiff presented to Michelle De La Torre, D.O., on July 25, 2008, with complaints of tingling in her left leg and arm.  (Tr. 264).  Upon examination, Dr. De La Torre noted decreased range of motion of the left shoulder and tenderness to palpation.  (Id.).  Plaintiff reported that she had strained her shoulder the prior week.  (Id.).  Plaintiff complained of calf pain on July 31, 2008.  (Tr. 263).  On August 1, 2008, Dr. De La Torre noted decreased range of motion of plaintiff's neck.  (Tr. 261).

Plaintiff presented to Roger J. Rembecki, M.D., on August 8, 2008, with complaints of chronic pelvic and low back pain.  (Tr. 317).  Plaintiff had a history of shooting pains in the legs. (Id.).  Upon examination, plaintiff had full range of motion, with some tenderness noted over the low back area.  (Id.).  Dr. Rembecki recommended diagnostic laparoscopy[4] to assess for probable causes of the lower back and pelvic pain.  (Id.).  On September 4, 2008, after plaintiff underwent

---

[4]Examination of the contents of the abdominopelvic cavity with a laparoscope passed through the abdominal wall.  Stedman's at 1047.

laparoscopy and lysis[5] of adhesions, Dr. Rembecki diagnosed plaintiff with severe dysmenorrhea[6]

with chronic pelvic pain; and pelvis and abdominal adhesive disease.  (Tr. 290).  On October 3,

2008, plaintiff reported that her pelvic pain had returned one to two weeks following surgery.

(Tr. 316).  Plaintiff also complained of "some kind of neuromuscular issue including spiders

running down the leg consistent with possible restless leg syndrome,"[7] and left leg pain.  (Id.).

Dr. Rembecki recommended a hysterectomy[8] to address plaintiff's pelvic pain.  (Id.).

   Plaintiff presented to Jennifer Barbin, M.D., on October 6, 2008, with complaints of "pins

and needles" pain in her legs bilaterally.  (Tr. 313).  Plaintiff also reported lower back pain.  (Tr.

314).  Dr. Barbin noted no abnormalities of the back or extremities on examination.  (Tr. 314).

Dr. Barbin diagnosed plaintiff with restless legs syndrome.  (Tr. 315).

   Plaintiff saw neurologist David M. Peeples, M.D., on November 6, 2008, for

electrodiagnostic evaluation and lower extremity EMG and nerve conduction studies.  (Tr. 266-

67).  Plaintiff reported persistent problems with her feet for the past five months.  (Tr. 266).

Plaintiff indicated that she feels like she is "standing on glass."  (Id.).  Plaintiff also had some

associated paresthesia and numbness.  (Id.).  Upon examination, Dr. Peeples noted tenderness to

palpation at the left greater than right Achilles tendon.  (Id.).  The electrodiagnostic findings were

normal.  (Tr. 266-67).  Dr. Peeples indicated that there was no supportive evidence for peripheral

---

[5]Destruction of red blood cells, bacterial, and other structures.  Stedman's at 1137.

[6]Painful menstruation.  Stedman's at 598.

[7]A sense of indescribable uneasiness, twitching, or restlessness that occurs in the legs after going to bed, frequently leading to insomnia, which may be relieved temporarily by walking about. Stedman's at 1911.

[8]Removal of the uterus.  Stedman's at 940.

neuropathy affecting the right or left foot, and that it appeared from plaintiff's exam that at least a portion of her symptoms are due to Achilles tendinitis.[9]  (Id.).

Plaintiff underwent a CT scan of the brain on March 6, 2009, which was normal.  (Tr. 274).

Plaintiff underwent a hysterectomy on April 6, 2009.  (Tr. 292).

On May 18, 2010, plaintiff presented to pain management specialist Anne T. Christopher, M.D., with complaints of chronic lower back pain with radiation down to the bilateral lower extremities.  (Tr. 365).  Plaintiff also reported calf cramping at nighttime, and acute onset of left heel pain.  (Id.).  Dr. Christopher indicated that plaintiff's scores on a pain questionnaire indicated "the moderate likelihood of symptom exaggeration with functional overlay."  (Tr. 366).  Upon examination, plaintiff had limitation of motion of the lumbar spine, an antalgic gait[10] on the left, diffuse tenderness with palpation to the upper and lower extremities, hypersensitivity throughout the bilateral lower extremities, and normal range of motion at the hips, knees, ankles, and toes.  (Tr. 366).  Plaintiff's neurologic examination revealed normal sensation in the lower extremities, and normal muscle stretch reflexes.  (Id.).  Dr. Christopher's impression was widespread pain in non-physiological or anatomic distribution; hypersensitivity bilateral lower extremities; heel pain on left NOS; and possible neuromuscular disorder.  (Tr. 367).  Dr. Christopher recommended a work-up with Dr. Nemeth for evaluation of the possible degenerative neuromuscular condition; an MRI of the lumbar spine for evaluation of possible radiculopathy;[11] and an evaluation by a

---

[9]Inflammation of the Achilles tendon.  Stedman's at 1944.

[10]A limp adopted so as to avoid pain on weight-bearing structures.  Stedman's at 99.

[11]Disorder of the spinal nerve root.  Stedman's at 1622.

podiatrist for plaintiff's heel pain.  (Id.).

Plaintiff underwent an MRI of the lumbar spine on June 1, 2010, which revealed posterior disc bulging with a central disc herniation appearing to abut the thoracic spinal cord at T10-T11. (Tr. 370).

Plaintiff saw Dr. Christopher on June 22, 2010, at which time plaintiff complained of left greater than right heel pain radiating up the lower extremity into the lumbar and thoracic area, and spasms, left greater than right lower extremities.  (Tr. 368).  Upon examination, plaintiff had diffuse pain with light palpation throughout the soft tissue and bony prominences; exquisite tenderness with palpation over the bilateral posterior hip and gluteus muscles; and intact sensation to the upper and lower extremities.  (Id.).  Dr. Christopher diagnosed plaintiff with widespread myofascial[12] pain; thoracic disc herniation T10-11, not a current pain generator; and possible neuromuscular disorder.  (Id.).  Dr. Christopher prescribed Savella[13] for plaintiff's myofascial pain, and recommended follow-up with Dr. Nemeth.  (Tr. 369).

Plaintiff saw Alan Morris, M.D., on August 2, 2010, for an orthopedic evaluation.  (Tr. 354-55).  Plaintiff complained of bilateral leg and foot pain; and back pain.  (Tr. 354).  Plaintiff reported that she is confined to bed much of the day, although she is able to sit for eight hours, stand for thirty minutes, and walk for thirty minutes.  (Id.).  Upon examination, Dr. Morris noted the following findings:  plaintiff walked quickly with no limp; stood erect; heel and toe walking

---

[12]Of or relating to the fascia surrounding and separating muscle tissue.  Stedman's at 1272.

[13]Savella is indicated for the treatment of pain caused by fibromyalgia that affects the muscles, tendons, ligaments, and supporting tissues.  See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

could be done with pain; she was able to dress, capable of normal finger control, rising from a chair, and getting on and off the examining table; pain to light palpation over the plantar surface of the feet, heels, calves, Achilles, and posterior hamstrings bilaterally, which was slightly increased on straight leg raise; and sensation was intact.  (Tr. 355).  Plaintiff demonstrated some limitation of range of motion of the shoulders, elbows, knees, hips, cervical spine, and lumbar spine.  (Tr. 363-64).  Dr. Morris diagnosed plaintiff with bilateral lower extremity pain of uncertain etiology.  (Id.).

Plaintiff underwent x-rays of the lumbar spine on August 2, 2010, which were negative. (Tr. 356).

Dr. Morris completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), in which he expressed the opinion that plaintiff could occasionally lift up to ten pounds, and never lift greater than ten pounds; sit continuously for four hours, and sit a total of eight hours in an eight-hour workday; stand for thirty minutes continuously, and stand a total of two hours in an eight-hour workday; and walk continuously for thirty minutes, and a total of one hour in an eight-hour workday.  (Tr. 358).  Plaintiff could use her hands frequently for reaching, handling, fingering, feeling, and pushing/pulling; use her feet occasionally for the operation of foot controls; occasionally climb stairs and ramps; never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl; and occasionally be exposed to unprotected heights, moving mechanical parts, and operate a motor vehicle.  (Tr. 359-61).

Plaintiff saw Patti M. Nemeth, M.D., on November 5, 2010, for a neurological consultation at the request of Dr. Christopher.  (Tr. 372-74).  Plaintiff's chief complaint was cramping pain in the legs.  (Tr. 372).  Plaintiff also reported numbness and tingling in the feet and

hands.  (Id.).  Plaintiff indicated that she had sustained three falls since 2008.  (Id.).  Plaintiff also

reported chronic low back pain, which does not radiate into the legs.  (Id.).  Plaintiff indicated

that Savella did not relieve her pain.  (Id.).  Dr. Nemeth stated that plaintiff had a two-year history

of progressive pain in the legs, which was now a constant achy pain with intermittent severe

muscle spasms.  (Tr. 374).  Dr. Nemeth indicated that plaintiff also had a two-year history of

unsteady gait.  (Id.).  Dr. Nemeth stated that plaintiff's neurological exam was notable for a distal

gradient to pinprick, marked loss in vibratory sense, and loss of proprioceptive[14] sense.  (Tr. 374).

Plaintiff had weakness in the lower extremities, which was likely due to pain.  (Id.).  Dr. Nemeth

stated that plaintiff's clinical picture suggests neuropathy, and she could not absolutely rule out a

central nervous system process.  (Id.).  Dr. Nemeth recommended laboratory tests for neuropathy,

and possibly nerve conduction studies and imaging studies of the brain.  (Id.).

Plaintiff saw Dr. Nemeth on February 8, 2011, at which time she diagnosed plaintiff with

weakness, pain, and spasms of uncertain etiology.  (Tr. 400).  Dr. Nemeth ordered an MRI of the

brain.  (Id.).

Plaintiff underwent an MRI of the brain on February 11, 2011, which revealed a 9-10 mm

nonenhancing lesion in the inferior left frontal lobe.  (Tr. 382).  The lesion was located at the

gray-white matter junction, did not have imaging appearances of a demyelinating lesion, and was

indeterminate.  (Id.).  Follow-up was recommended in three months.  (Id.).

Plaintiff also underwent an MRI of the cervical spine, which revealed mild cervical

---

[14]Capable of receiving stimuli originating in muscles, tendons, and other internal tissues.
Stedman's at 1576.

spondylosis.[15]  (Tr. 385).

Plaintiff saw Dr. Nemeth on March 2, 2011, at which time Dr. Nemeth indicated that nerve conduction studies of the lower extremities conducted on that day provided evidence for neuropathy.  (Tr. 401).

Plaintiff was treated in the emergency room at St. Johns Hospital on April 10, 2011, for diagnoses of hyperventilation, anxiety, and abdominal pain.  (Tr. 402).  Plaintiff was prescribed Klonopin,[16] and her Zanaflex[17] and Topamax were continued.  (Tr. 402).

Plaintiff saw Dr. Nemeth on April 21, 2011, with complaints of severe pain and weakness in the right leg.  (Tr. 427).  Dr. Nemeth diagnosed plaintiff with severe neuropathy.  (Id.).  Dr. Nemeth indicated that plaintiff was to start IV IG[18] on May 20, 2011.  (Id.).  Dr. Nemeth prescribed a wheelchair due to plaintiff's low back pain and right leg weakness.  (Tr. 423).  Dr. Nemeth also prescribed physical therapy for plaintiff's low back pain.  (Tr. 422).

Dr. Nemeth completed a Peripheral Neuropathy Medical Assessment Form on April 21, 2011.  (Tr. 416-21).  Dr. Nemeth indicated that she had been treating plaintiff since July 2008 for diagnoses of peripheral neuropathy, arthritis, and a non-specific lesion on the brain.  (Tr. 416).

---

[15]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature.  Stedman's at 1813.

[16]Klonopin is indicated for the treatment of panic disorder.  See Physician's Desk Reference ("PDR"), 2639 (63rd Ed. 2009).

[17]Zanaflex is indicated for the treatment of muscle spasms.  See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

[18]Intravenous Immunoglobulin ("IV IG") is indicated for the treatment of a wide range of autoimmune and inflammatory conditions.  See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

Plaintiff was to begin IV IG on May 25, 2011.  (Id.).  Plaintiff's positive objective signs included swelling, spasm, muscle weakness, tenderness, crepitus, impaired sleep, impaired appetite, weight change, sensory changes, atrophy, motor loss, and chronic fatigue.  (Tr. 417).  Plaintiff had significant limitation of motion of the left shoulder.  (Id.).  Plaintiff's medications caused drowsiness/sedation.  (Tr. 418).  Dr. Nemeth expressed the opinion that plaintiff was able to sit ten minutes at a time and sit a total of less than two hours in an eight-hour workday; stand twenty minutes, and stand less than two hours in an eight-hour workday; occasionally lift less than ten pounds and never lift ten pounds or more; never twist or stoop; unable to reach overhead; unable to grasp with her left hand; able to grasp with her right hand ten percent of the workday; and use her fingers for fine manipulations ten percent of the workday.  (Tr. 418-20).  Dr. Nemeth found that plaintiff would need to take unscheduled breaks more than ten times during an average workday; should elevate her legs with prolonged sitting; must use a cane or other assistive device for balance.  (Id.).  Finally, Dr. Nemeth indicated that plaintiff would likely be absent from work due to her impairments more than four days a month.  (Tr. 420).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.

2. The claimant has not engaged in substantial gainful activity since August 22, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: obesity, Achilles tendonitis, peripheral neuropathy (20 CFR 404.1520(c)).

- 14 -

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except claimant must avoid climbing stairs and ramps and climbing ropes, ladders, and scaffolds.  The claimant can frequently push and pull with her legs and can frequently use her hands for fingering and fine manipulation.

6.      The claimant is capable of performing past relevant work as a cashier, front desk drycleaners clerk, and fast food worker.  This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from August 22, 2008, through the date of this decision  (20 CFR 404.1520(f)).

(Tr. 14-18).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on August 22, 2009, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

(Tr. 18).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

- 15 -

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry."  Id.

## B.      **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has

the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598,

601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137,

141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§

404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a

medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c),

416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or

physical ability to do "basic work activities."  Id.  Age, education and work experience of a

claimant are not considered in making the "severity" determination.  See id.

      If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

- 17 -

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.**   **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining plaintiff's RFC.  Specifically, plaintiff contends that the ALJ failed to point to medical evidence in support of his finding.

- 18 -

Plaintiff next argues that the hypothetical question posed to the vocational expert was erroneous.

The undersigned will discuss plaintiff's claims in turn.

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform light work as defined in
20 CFR 404.1567(b) except claimant must avoid climbing stairs and ramps and
climbing ropes, ladders, and scaffolds.  The claimant can frequently push and pull   with
her legs and can frequently use her hands for fingering and fine                    manipulation.

(Tr. 15).

 RFC is what a claimant can do despite her limitations, and it must be determined on the

basis of all relevant evidence, including medical records, physician's opinions, and claimant's

description of her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  Although

the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant

evidence, a claimant's RFC is a medical question.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th

Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is

required to consider at least some supporting evidence from a medical professional.  See Lauer,

245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC);

Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that

must find at least some support in the medical evidence in the record).  An RFC determination

made by an ALJ will be upheld if it is supported by substantial evidence in the record.  See Cox v.

Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff contends that, in determining plaintiff's RFC, the ALJ erred in rejecting the

opinion of treating neurologist Dr. Nemeth.  Dr. Nemeth completed a Peripheral Neuropathy

Medical Assessment Form on April 21, 2011, in which she expressed the opinion that plaintiff was

able to sit ten minutes at a time and sit a total of less than two hours in an eight-hour workday;

stand twenty minutes, and stand less than two hours in an eight-hour workday; occasionally lift

less than ten pounds and never lift ten pounds or more; never twist or stoop; unable to reach

overhead; unable to grasp with her left hand; able to grasp with her right hand ten percent of the

workday; and use her fingers for fine manipulations ten percent of the workday.  (Tr. 418-20).

Dr. Nemeth found that plaintiff would need to take unscheduled breaks more than ten times

during an average workday; should elevate her legs with prolonged sitting; must use a cane or

other assistive device for balance.  (Id.).  Finally, Dr. Nemeth indicated that plaintiff would likely

be absent from work due to her impairments more than four days a month.  (Tr. 420).

    "A treating physician's opinion should not ordinarily be disregarded and is entitled to

substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the

record."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).  See also SSR 96-

2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's

medical opinion unless the opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques.").  However, "[w]hen a treating physician's opinions are

inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."

Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted).

    "'When an ALJ discounts a treating physician's opinion, he should give good reasons for

doing so.'"  Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) (quoting Davidson v. Astrue,

501 F.3d 987, 990 (8th Cir. 2007)).  When an opinion is not given controlling weight as the

opinion of a treating source, the weight given to the opinion depends on a number of factors,

- 20 -

including whether the source has examined the claimant, the nature and extent of the treatment

relationship, the relevant evidence provided in support of the opinion, the consistency of the

opinion with the record as a whole, whether the opinion is related to the source's area of

specialty, and other factors.  20 C.F.R. §§ 404.1527(c).

The ALJ indicated that he was rejecting the opinions of Dr. Nemeth because they were not

supported by "any significant clinical findings made at the time she completed the statement."

(Tr. 16).  The ALJ also stated that Dr. Nemeth's findings were inconsistent with other medical

findings of record.  (Id.).

The ALJ's determination that Dr. Nemeth noted no significant findings is not supported by

the record.  Plaintiff saw Dr. Nemeth for a neurological consultation in November 2010, at which

time plaintiff complained of numbness and tingling in the feet and hands and indicated that she had

sustained multiple falls.  (Tr. 372).  Dr. Nemeth indicated that plaintiff had a two-year history of

progressive pain in the legs, with intermittent severe muscle spasms.  (Tr. 374).  Dr. Nemeth

found that plaintiff's neurological exam was notable for a distal gradient to pinprick, marked loss

in vibratory sense, and loss of proprioceptive sense.  (Id.).  Plaintiff also had weakness in the

lower extremities, which was likely due to pain.  (Id.).  Dr. Nemeth indicated that plaintiff's

clinical picture suggested neuropathy, and ordered further testing.  (Id.).  In February 2011, Dr.

Nemeth diagnosed plaintiff with weakness, pain, and spasms of uncertain etiology, and ordered an

MRI of the brain.  (Tr. 400).  On March 2, 2011, Dr. Nemeth indicated that nerve conduction

studies of the lower extremities conducted on that day provided evidence for neuropathy.  (Tr.

401).  On April 21, 2011, the day Dr. Nemeth authored her assessment, Dr. Nemeth diagnosed

plaintiff with severe neuropathy.  (Tr. 427).  Dr. Nemeth prescribed a wheel chair due to

plaintiff's low back pain and right leg weakness, and indicated that plaintiff would start IV IG on May 20, 2011.  (Tr. 423, 427).  In sum, Dr. Nemeth noted the following objective findings on examination: significant sensory loss, weakness in the lower extremities, and muscle spasms.  (Tr. 374).  Dr. Nemeth stated that plaintiff's clinical picture suggested neuropathy, and nerve conduction studies of the lower extremities performed on March 2, 2011 provided evidence of neuropathy.  (Tr. 401).

The ALJ also indicated that Dr. Nemeth's findings, specifically plaintiff's need for a wheelchair, were inconsistent with the other medical evidence of record.  (Tr. 16).  The ALJ stated that Dr. Christopher indicated that plaintiff was exaggerating her symptoms; and Drs. Morris and Peeples found little in the way of actual objective abnormalities.  (Id.).

Plaintiff saw Dr. Christopher, a pain management physician, in May 2010, with complaints of chronic lower back pain with radiation down to the bilateral lower extremities.  (Tr. 365).  Dr. Christopher noted that plaintiff's scores on a pain questionnaire indicated the "moderate likelihood of symptoms exaggeration with functional overlay."  (Tr. 366).  Upon examination, Dr. Christopher noted the following findings: limitation of motion of the lumbar spine, an antalgic gait on the left, diffuse tenderness with palpation to the upper and lower extremities, and hypersensitivity throughout the bilateral lower extremities.  (Id.).  Dr. Christopher diagnosed plaintiff with widespread pain in non-physiological or anatomic distribution; hypersensitivity bilateral lower extremities; heel pain on left NOS; and possible neuromuscular disorder.  (Tr. 367).  In June 2010, Dr. Christopher noted diffuse pain with light palpation throughout the soft tissue and bony prominences; and exquisite tenderness with palpation over the bilateral posterior hip and gluteus muscles.  (Tr. 368).  Dr. Christopher again diagnosed plaintiff with a possible

neuromuscular disorder, prescribed Savella for plaintiff's myofascial pain, and recommended follow-up with Dr. Nemeth.  (Tr. 369).  Contrary to the ALJ's finding, Dr. Christopher did not indicate that plaintiff was exaggerating her symptoms.  The ALJ mentioned that a pain questionnaire plaintiff completed indicated a "moderate likelihood" of symptom exaggeration, but Dr. Christopher never found that plaintiff was in fact exaggerating her symptoms.  Instead, Dr. Christopher noted some abnormalities on examination, diagnosed plaintiff with a possible neuromuscular disorder, and prescribed pain medication.

Plaintiff saw neurologist Dr. Peeples on November 6, 2008, for electrodiagnostic evaluation and lower extremity EMG and nerve conduction studies.  (Tr. 266-67).  Upon examination, Dr. Peeples noted tenderness to palpation of the Achilles tendon.  (Tr. 266).  As the ALJ pointed out, Dr. Peeples noted that the electrodiagnostic findings were normal.  (Id.).  Dr. Peeples found that at least a portion of plaintiff's symptoms were due to Achilles tendonitis.  (Id.).

Finally, plaintiff saw Dr. Morris on August 2, 2010, for a consultative orthopedic evaluation.  (Tr. 354-64).  Upon examination, Dr. Morris noted the following findings:  heel and toe walking could be done with pain; pain to light palpation over the plantar surface of the feet, heels, calves, Achilles, and posterior hamstrings bilaterally, which was slightly increased on straight leg raise; and some limitation of range of motion of the shoulders, elbows, knees, hips, cervical spine and lumbar spine.  (Tr. 355, 363-64).  Dr. Morris diagnosed plaintiff with bilateral lower extremity pain of uncertain etiology.  (Tr. 355).  Although the ALJ indicated that Dr. Morris found few abnormalities, Dr. Morris noted limitation of range of motion of plaintiff's shoulders, elbows, knees, hips, cervical spine and lumbar spine.  (Tr. 363-64).

- 23 -

In addition, Dr. Morris completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), in which he expressed the opinion that plaintiff could occasionally lift up to ten pounds, and never lift greater than ten pounds; sit continuously for four hours, and sit a total of eight hours in an eight-hour workday; stand for thirty minutes continuously, and stand a total of two hours in an eight-hour workday; and walk continuously for thirty minutes, and a total of one hour in an eight-hour workday. (Tr. 358). Plaintiff could use her hands frequently for reaching, handling, fingering, feeling, and pushing/pulling; use her feet occasionally for the operation of foot controls; occasionally climb stairs and ramps; never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl; and occasionally be exposed to unprotected heights, moving mechanical parts, and operate a motor vehicle. (Tr. 359-61). The ALJ did not discuss Dr. Morris' opinions.

The undersigned finds that the RFC formulated by the ALJ is not supported by substantial evidence. The ALJ rejected the opinions of plaintiff's treating neurologist, Dr. Nemeth, finding that they were unsupported by Dr. Nemeth's own findings and the other medical evidence of record. As previously discussed, however, Dr. Nemeth noted objective findings on examination suggestive of neuropathy, and nerve conduction studies of the lower extremities performed in March 2011 confirmed a diagnosis of neuropathy. (Tr. 401). Plaintiff consistently complained of lower extremity symptoms and, contrary to the ALJ's finding, no physician found that plaintiff was exaggerating.

In support of his RFC determination, the ALJ indicated that Dr. Morris noted little abnormalities on examination. Dr. Morris, however, noted objective findings and completed a medical source statement that the ALJ did not address. Significantly, Dr. Morris' opinions are

- 24 -

inconsistent with the ALJ's RFC determination.  Dr. Morris found limitations consistent with the ability to perform only a limited range of sedentary work.

In sum, the ALJ erred in determining plaintiff's RFC.  Every physician who examined plaintiff found limitations greater than those found by the ALJ.  The ALJ found that plaintiff was capable of performing a range of light work, which requires "a good deal of walking or standing." 20 C.F.R. § 404.1567(b).  Objective testing confirmed the presence of neuropathy.  Plaintiff's neuropathy would be expected to significantly limit plaintiff's ability to stand, as found by Drs. Nemeth and Morris.  The ALJ failed to point to any medical evidence in support of his finding that plaintiff was capable of performing a limited range of light work.

The hypothetical question posed by the ALJ to the vocational expert was based on this erroneous RFC.  Thus, the vocational expert's response does not constitute substantial evidence supporting the Commissioner's denial of benefits.

## Conclusion

The decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence.  The ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly evaluate the medical opinions of record; formulate a new residual functional capacity for plaintiff based on the medical evidence in the record; and then to continue with the next steps of the sequential evaluation process.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  16th  day of September, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE